Filed 1/25/22 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| CAROLYN PAPPAS et al., | 2d Civil No. B304347 |
| | (Super. Ct. No. 1417388) |
| Plaintiffs and Appellants, | (Santa Barbara County) |
| v. | ORDER MODIFYING |
| | OPINION AND DENYING |
| STATE COASTAL | REHEARING (NO CHANGE |
| CONSERVANCY et al., | IN JUDGMENT) |
| Defendants and Respondents, | |
| GAVIOTA COASTAL TRAIL ALLIANCE, | |
| Intervener and Appellant. | |

THE COURT:

The opinion in the above-entitled matter filed on December 28, 2021, is modified as follows:

1. On page 16, first full paragraph, the fifth sentence beginning with "Alternatively, Hollister characterized" is deleted and replaced with the following:

Alternatively, Hollister contended that whatever rights the OTD conveyed did not fit within the statute's express definition of "'state land,'" i.e., "a fee, title, easement, deed restriction, or other interest in land." (§ 30609.5, subd. (e).)

2. On page 17, second full paragraph, the third sentence beginning with "Whether the OTD" is deleted and replaced with the following:

Whether the OTD created an irrevocable license in favor of the public was an open issue when the trial court ruled on the Alliance's motion for judgment.

This modification does not change the judgment.

Appellant's petition for rehearing is denied.

_____
GILBERT, P.J.          YEGAN, J.          PERREN, J.

2

Filed 12/28/21 (unmodified opinion)

# CERTIFIED FOR PUBLICATION

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION SIX

| | |
|---|---|
| CAROLYN PAPPAS et al., | 2d Civil No. B304347 |
| Plaintiffs and Appellants, | (Super. Ct. No. 1417388) |
| | (Santa Barbara County) |
| v. | |
| STATE COASTAL CONSERVANCY et al., | |
| Defendants and Respondents; | |
| GAVIOTA COASTAL TRAIL ALLIANCE, | |
| Intervener and Appellant. | |

The California Coastal Act (Pub. Resources Code, § 30000 et seq.[1]) restricts selling or transferring certain state-owned

---

[1] All statutory references are to the Public Resources Code unless otherwise stated.

property interests near the coast. This case addresses whether a purported "public access easement" granted to a state agency four decades ago by the owner of a large coastal parcel in Hollister Ranch (the Ranch) is a property interest subject to these restrictions. We conclude it is.

The Ranch is a gated community and working cattle ranch on Santa Barbara County's Gaviota Coast. Precipitous geography and a guarded entrance ensure seclusion for those who reside upon one of its 100-acre parcels. State agencies and civic activists have long quarreled with the Hollister Ranch Owners Association (HROA) and its owner-members (collectively Hollister) over the public's right to recreate along the Ranch's pristine shoreline. The California Coastal Commission and the Coastal Conservancy (collectively State Defendants) settled a contentious case with Hollister over this issue in 2016. Hollister agreed, among other things, to allow pre-approved organizations and school groups to use a small section of beach for recreation and tide pool exploration.

The self-described Gaviota Coastal Trail Alliance (Alliance) considered the settlement a capitulation to Hollister. The trial court permitted the Alliance to intervene as a defendant and to later file a cross-complaint. The Alliance alleged the State Defendants violated, among other laws, the Coastal Act and the Bagley-Keene Open Meeting Act (Gov. Code, § 11120 et seq.) when they settled with Hollister. The Alliance then moved for judgment. The trial court agreed the State Defendants violated section 30609.5 of the Coastal Act, restricting transfers of state property interests along the coast. It declared the settlement agreements invalid and entered judgment on the cross-complaint

2

against the Conservancy. It found the balance of the Alliance's claims either moot or barred by the statute of limitations.

Hollister appeals the section 30609.5 ruling. The Alliance cross-appeals the statute of limitations rulings. We conclude the Commission as well as the Conservancy violated section 30609.5 and direct the trial court to enter judgment against both State Defendants on remand. Judgment is otherwise affirmed.

FACTUAL BACKGROUND

The Ranch consists of 14,500 acres of private land running east-west along the Gaviota Coast in Santa Barbara County. It falls within the boundaries of the former Rancho Nuestra Señora del Refugio, a 26,529-acre Spanish land grant obtained by José Francisco Ortega in 1794 after serving on the expeditions of Gaspar de Portolà, and, later, Franciscan missionary Junípero Serra. William Welles Hollister purchased the eponymous acreage from Ortega's descendants in 1866. Hollister's family sold the Ranch to developers in 1965.

The Young Men's Christian Association of Metropolitan Los Angeles (YMCA) obtained a 160-acre inland parcel within the Ranch in 1970. It envisioned a youth camp for the site. The acquisition included a recreation easement over a 3,880-foot stretch of the Ranch's coast known as Cuarta Canyon Beach and an exclusive easement[2] over a one-acre plot above the beach for

---

[2] The owner of an estate burdened by an easement generally retains the right to "make any use of the land that does not interfere unreasonably with the easement." (*Pasadena v. California-Michigan Land & Water Co.* (1941) 17 Cal.2d 576, 579.) An exclusive easement, in contrast, "is an unusual interest in land; it has been said to amount almost to a conveyance of the fee. . . . No intention to convey such a complete interest can be

restroom and educational facilities.  YMCA also received access easements over various roads and footpaths leading to the beach, which was located about a mile south of the inland parcel.  We refer to these collectively as the "YMCA Easements."[3]

The Ranch's owner, MGIC Equities Corporation (MGIC), subdivided the land surrounding YMCA's holdings in 1971.  (AA 244)  It created 135 separate parcels of approximately 100 acres each and marketed them for residential development.  Those buying land in the new subdivision agreed to join the HROA and to observe building and occupancy restrictions designed to preserve the area's rural and agricultural heritage.  They also agreed to join the Hollister Ranch Cooperative (HRC) and to dedicate at least 98 percent of their land to grazing, orchards, or other agricultural uses.  This enabled the Ranch to qualify as an agricultural preserve under California's Land Conservation Act[4] and thereby lower the owners' property tax rates.  (Gov. Code, § 51200 et seq.)  MGIC excluded YMCA's parcel from the subdivision.

---

imputed to the owner of the servient tenement in the absence of a clear indication of such an intention."  (*Id*. at pp. 578-579.)

[3] The access easements included the right to traverse: (1) Rancho Real Road, the Ranch's main east-west thoroughfare along the coast; (2) Cuarta Canyon Road, the road linking Ranch Real Road to YMCA's parcel; (3) a 20-foot-wide path from Rancho Real Road down to the beach; and (4) a 10-foot-wide path from Rancho Real Road to the bluffs above Cuarta Canyon Beach.

[4] The Land Conservation Act is also known as the Williamson Act.

YMCA finished plans for the camp in the late 1970s. It applied for a Coastal Development Permit (CDP) allowing it to build a recreation center, dining commons, education facilities, and housing for 150 campers and staff. The Commission issued the CDP on the condition YMCA guarantee public access to Cuarta Canyon Beach. YMCA satisfied this condition by executing and recording an "Irrevocable Offer to Dedicate and Covenant Running with the Land" on April 28, 1982 (OTD). The OTD offered the public what in essence constituted an "easement over [the] easements" YMCA obtained from MGIC in 1970. YMCA also agreed to let the public use a proposed four-mile trail running along the coastal bluffs from Cuarta Canyon Beach eastward to Gaviota State Park (the Blufftop Trail Easement). The OTD authorized the Commission to accept the OTD on the public's behalf any time between 1992 and 2013.

YMCA began building the camp shortly after recording the OTD. HROA immediately sued to enjoin construction.[5] YMCA abandoned the project after HROA offered to reimburse its planning and construction costs. HROA then annexed the parcel into the subdivision, sold it to a private buyer, and directed the sale proceeds paid to YMCA. An entity called Rancho Cuarta now owns YMCA's former property.[6] All 136 parcels within the Ranch's boundaries now belong to the subdivision.

---

[5] The basis of HROA's suit against YMCA is not disclosed in the record.

[6] Appellants named Rancho Cuarta as a defendant. The trial court dismissed Rancho Cuarta after it settled with appellants, the Commission, and the Conservancy in 2017.

5

The Ranch's owners and guests enjoy exclusive overland access to its 8.5 miles of coast. HROA holds title to the parcels along the beach as a common recreation area. A guarded gate admits vehicles from one entry point at the subdivision's eastern boundary. Consequently, beach access is limited to members of the public who can walk over the sand from Gaviota State Park to the east or from Jalama Beach County Park to the west. HROA requires these visitors stay below the mean high tide line to avoid trespassing on its beach parcels.[7] The area's rugged geography leaves large stretches of its coast accessible only by small watercraft.

PROCEDURAL HISTORY

The Conservancy[8] accepted the OTD on behalf of the Commission in 2013. Hollister immediately filed this action. The complaint alleged YMCA could not legally sever its appurtenant easement rights from the inland parcel by dedicating access to the public. Further, it alleged the proposed four-mile public trail described in the OTD appeared to have no basis in YMCA's deeds from MGIC. The complaint sought judgment quieting title to the State Defendants' easement claims and declaring the OTD *void ab initio*, among other remedies.

---

[7] The public trust doctrine designates that portion of the beach between the mean high tide line and mean low tide line as held in trust for public use. (*Lent v. California Coastal Com.* (2021) 62 Cal.App.5th 812, 858, citing *State of California v. Superior Court (Lyon)* (1981) 29 Cal.3d 210, 214.)

[8] The State Coastal Conservancy "serve[s] as a repository for lands whose reservation is required to meet the policies and objectives" of the Coastal Act. (Pub. Resources Code, § 31104.1.)

6

The parties entered settlement negotiations after the trial court denied their cross-motions for summary judgment. These negotiations resulted in two agreements: one resolving the HROA's claims (the HROA Settlement) and one resolving the class action claims of individual owners (the Class Settlement). In each, the State Defendants agreed to quitclaim their interests in the OTD in exchange for limited, but guaranteed, public access to the Ranch's beaches.[9] The boards of the Commission and Conservancy approved the settlements in closed session. The court then ordered the settling parties, over their objections, to publish a public notice describing the settlement and specifying a deadline to object before the final fairness hearing. The notice ran in the Santa Barbara News-Press in June of 2018.

The Alliance objected to the Class Settlement and moved to intervene in the action. It described itself as "an ad hoc alliance of organizations . . . committed to effectuating a continuous Coastal Trail from Gaviota State Park to Jalama Beach County Park, and appropriate vertical access to Hollister Ranch beaches to provide safe and appropriate coastal access for members of the public."[10] The settling parties opposed the group's motion to

[9] The HROA and Class Settlements propose access to specified beaches and facilities through a "Tidepool School Program" for school children and a "Non-Profit Access Program" giving preference to community organizations providing services to the disabled, children, and underserved populations.

[10] The Alliance includes the Gaviota Coast Conservancy, California Coastal Protection Network, Coastwalk/California Coastal Trail Association, and Santa Barbara County Trails Council.

intervene.  HROA described it as a Trojan Horse that would enable the Alliance "to launch a broadside attack on the 2017 Settlement and to force the State and the Hollister Ranch to a trial."  The Class Plaintiffs agreed the Alliance's objections were a pretext to expand and relitigate a long-running case in which the group had no interest.  The trial court granted the motion to intervene.

The Class Plaintiffs nevertheless moved for final approval of the Class Settlement, which fully incorporated the terms of the HROA Settlement.  The Alliance again objected and moved to set aside both.  The trial court decided the Alliance's increasingly complex challenges now exceeded the scope of the operative pleadings.  It granted the Alliance leave to file a cross-complaint to provide "the structure and procedural tools" for the court to address the validity and effectiveness of both settlements.

The Alliance filed a cross-complaint and petition for writ of mandate (the writ petition) two weeks later.  The writ petition contained *inter alia* eight causes of action under the Coastal Act and the Bagley-Keene Open Meeting Act (Gov. Code, § 11120 et seq.).  Hollister demurred without success.  The Alliance then moved for judgment in lieu of trial on six of the cross-complaint's eight causes of action.[11]  The trial court granted judgment in favor of the Alliance on the second cause of action, finding the Conservancy violated the Coastal Act by agreeing to quitclaim the OTD to Hollister without complying with the Act's hearing and fact-finding procedures.  (§ 30609.5, subd. (c).)  It declared

---

[11] The Alliance's "Motion for Judgment on the Writ" sought rulings on the cross-complaint's first through fifth and seventh causes of action.  The group dismissed its sixth and eighth causes of action prior to moving for judgment.

8

the settlements invalid on this ground. The ruling mooted all other causes of action except the Alliance's Bagley-Keene Act claim, which the court found time-barred.

Hollister appealed. The Alliance cross-appealed. The trial court granted a request to stay the proceedings on Hollister's quiet title action in the interim.

DISCUSSION

Hollister contends the trial court erred when it: (1) permitted the Alliance to intervene; (2) overruled Hollister's demurrer to the Alliance's subsequent writ petition; (3) found the Bagley-Keene Act's pending litigation exception did not override section 30609.5's public hearing requirements; (4) found the Conservancy in fact violated section 30609.5 when it settled with Hollister; (5) deprived Hollister of due process by entering judgment before it decided the validity of the OTD; and (6) admitted certain stipulated facts as evidence against Hollister. On cross-appeal, the Alliance contends the trial court erred when it found the limitations periods had expired on certain Bagley-Keene and Coastal Act claims.

*1. The Trial Court Properly Exercised Its Discretion When It Allowed the Alliance to Intervene*

Those not entitled to intervene as a matter of right in an action must move to intervene permissively. (Code Civ. Proc., § 387, subd. (d)(2).) The moving party must "[have] an interest in the matter in litigation, or in the success of either of the parties, or an interest against both." (*Ibid.*) This requires the moving party to show their involvement will not enlarge the issues in the action, among other things. (*Gray v. Begley* (2010) 182 Cal.App.4th 1509, 1521, citing *Noya v. A.W. Coulter Trucking* (2006) 143 Cal.App.4th 838, 842.) We review the ruling below for

9

abuse of discretion, confining our inquiry to whether the trial court exceeded the bounds of reason. (*Grey*, at p. 1521.)

Hollister contends the Alliance's intervention enlarged the scope of the case by raising issues going beyond the Second Amended Complaint. We disagree. The Alliance's proposed answer and objections fell within the matters raised by the Class Plaintiffs' Second Amended Complaint. These filings focused exclusively on public access to the Ranch's coastal byways and beaches, and on the alleged rights created by the OTD and the Conservancy's accepting the same in 2013. In addition, the trial court properly considered judicial economy and multiplicity of suits when deciding the motion. (See *Simpson Redwood Co. v. State of California* (1987) 196 Cal.App.3d 1192, 1203 ["Nor do we find that intervention would subvert the salutary purposes of section 387, subdivision (b), to obviate delays and prevent a multiplicity of suits . . . . On the contrary, were intervention to be denied in the present case, appellant would be forced to bring a separate action . . ."].) The trial court recognized intervention would delay the class action fairness proceedings but would eliminate the risk of the Alliance filing a separate mandamus action against the State Defendants or attacking the stipulated judgment upon entry.[12] Illegalities in the Class Settlement's

---

[12] Indeed, counsel for Class Plaintiffs insisted here and below that a duplicate mandamus action was the proper process for the Alliance to challenge the State Defendants' settlements. We agree the Alliance could have attacked the parties' stipulated judgment by mandamus. (See *Summit Media LLC v. City of Los Angeles* (2012) 211 Cal.App.4th 921, 933 [third party sought to invalidate settlement agreement between city and media company that violated city ordinance relating to billboard

terms would have infect any stipulated judgment entered by the court.  (See *California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1990) 50 Cal.3d 658, 664 [court may decline to enter judgment on a stipulation that violates public policy or "an erroneous rule of law"].)

Hollister describes the trial court's intervention ruling as portending the collapse of California's class action bar.  Soliciting the participation of every "Tom, Dick or Harry" by publishing notice of the Class Settlement, Hollister insists, violated standard class action procedures and "[ran] directly counter to the public policy seeking to incentivize counsel to take a class case, not make such a case prohibitively difficult."  It likened the Alliance to professional objectors who "[feed] off the fees earned by class counsel" by asserting meritless challenges to settlements.  (See *Hernandez v. Restoration Hardware, Inc.* (2018) 4 Cal.5th 260, 272.)  We are not persuaded.  Class Plaintiffs seek primarily equitable and declaratory remedies that would not create a pool of money from which class counsel or professional objectors could siphon their pecuniary "incentives."[13]  Hollister does not explain

---

advertising].)  However, this did not preclude the Alliance from seeking prejudgment relief via intervention.

[13] Hollister does seek monetary damages, but only in the event they lose their quiet title claims and must proceed on an alternative theory, i.e., that the Commission's acceptance of the OTD constituted an unconstitutional taking.  The Class Settlement includes no pecuniary component except the State Defendants' agreeing to use money collected from the Ranch's in-lieu fees program to fund expanded public access under a negotiated license.

11

how the economic considerations at issue in *Hernandez* apply here.

Hollister cautions that permitting third parties such as the Alliance to intervene under these circumstances undermines the State's ability to litigate and settle cases on behalf of the public. This overstates the implications of the ruling. Motions to intervene by nature require courts to balance the often competing interests of the original parties and potential intervenors. Such is the case in the instant matter. Hollister and the State Defendants understandably sought to conclude a prolonged and costly dispute; the Alliance sought to re-open the dispute to ensure the State Defendants complied with the Coastal Act and Bagley-Keene Act. The trial court's lengthy intervention order showed it grappled with these competing interests. The ruling adhered to the principle that courts should construe section 387 liberally in favor of intervention. (*City of Malibu v. California Coastal Com.* (2005) 128 Cal.App.4th 897, 906.) It was also consonant with the Coastal Act's aim of preserving the public's right "to fully participate in decisions affecting coastal planning, conservation, and development." (§ 30006.)

### 2. The Trial Court Correctly Overruled Hollister's Demurrer to the Alliance's Writ Petition

Hollister demurred to the writ petition on the same grounds it opposed intervention, i.e., that the Alliance sought to enlarge the scope of the case. The trial court overruled the demurrer as a "reargument of well-trodden issues." We agree. Hollister filed this quiet title action to resolve a dispute over the existence and scope of public access rights granted under the OTD. The writ petition, like the motion to intervene, addressed whether the State Defendants properly disposed of these

12

potential access rights when it settled with Hollister.  This inquiry is part of the broader dispute Hollister itself brought before the court.

3. *The Pending Litigation Exception to the Bagley-Keene Act Did Not Excuse the Conservancy from Adhering to the Coastal Act's Restrictions on Selling or Transferring State Lands*

The Coastal Act prohibits the state from selling or transferring its interests in "state land" along the coast unless it "retains a permanent property interest . . . adequate to provide public access to or along the sea."  (§ 30609.5, subd. (a).)  The Legislature enacted this provision in 1999 to "address the permanent loss of public coastal accessways by preventing the sale or transfer of state land located between the first public road and the sea."  (Sen. Rules Com., Off. of Senate Floor Analyses, 3d reading analysis of Assem. Bill No. 492 (1999-2000 Reg. Sess.) as amended Aug. 16, 1999, p. 4.)  The Conservancy can circumvent section 30609.5(a)'s restrictions by making one or more access-related findings at a noticed hearing.  (§ 30609.5, subd. (c).)[14]

_____

[14] Section 30609.5, subdivision (c) permits a transfer only if the relevant agency finds:  "(1) The state has retained or will retain, as a condition of the transfer or sale, permanent property interests on the land providing public access to or along the sea. [¶] (2) Equivalent or greater public access to the same beach or shoreline area is provided for than would be feasible if the land were to remain in state ownership. [¶] (3) The land to be transferred or sold is an environmentally sensitive area with natural resources that would be adversely impacted by public use, and the state will retain permanent property interests in the land that may be necessary to protect, or otherwise provide for the permanent protection of, those resources prior to or as a condition of the transfer or sale. [¶] (4) The land to be transferred

13

The Alliance's second cause of action alleged the OTD constituted an interest in state land, and, as such, could not be transferred to Hollister until the Conservancy complied with section 30609.5. The trial court agreed, finding the Conservancy violated the statute by agreeing to quitclaim its interest in the OTD without holding a public section 30609.5 hearing. It declared the HROA Settlement invalid but expressed no opinion about how the Conservancy "should or must proceed with respect to approval, or not, of the HROA Settlement."

Hollister argues the Bagley-Keene Act, California's open meeting laws for state-level bodies, authorized the Conservancy to discuss and approve the Hollister settlements in closed session without holding the section 30609.5 hearing. (See Gov. Code, § 11120 et seq.)[15] It refers specifically to the Act's "pending litigation exception," which allows agencies "to confer with, or receive advice from, [the state body's] legal counsel regarding pending litigation when discussion in open session concerning those matters would prejudice the position of the state body in the litigation." (*Id.*, § 11126, subd. (e)(1).) Hollister cites *Southern California Edison Co. v. Peevey* (2003) 31 Cal.4th 781 (*Peevey*) as authority for invoking the exception here.

In *Peevey* a public interest group intervened in an action between Edison and the Public Utilities Commission (PUC) over electricity rates. The group then challenged the parties' proposed

_____

or sold has neither existing nor potential public accessway to the sea."

[15] We granted Hollister's request for judicial notice of legislative materials related to the Bagley-Keene Act, dated September 8, 2020, in our order of September 29, 2020.

14

settlement because PUC violated a statute requiring any rate change to be made in an "open and public" fact-finding hearing. (Gov. Code., § 11126, subd. (d)(1).) The Supreme Court rejected the group's challenge because the proposed settlement fell within the Bagley-Keene Act's pending litigation exception.

*Peevey*, however, hinged on the PUC settlement's terms, which, the high court concluded, did not in fact change utility rates. (*Peevey*, *supra*, 31 Cal.4th at pp. 803-805.) This meant the hearing requirements applying to rate-setting decisions had not been triggered. The decision does not as Hollister's suggests give state bodies *carte blanche* to jettison extrinsic statutory obligations, e.g., section 30609.5's transfer restrictions, when settling a litigated matter. *Peevey* would have ended differently had the disputed settlement changed rates. (See *Trancas Property Owners Assoc. v. City of Malibu* (2006) 138 Cal.App.4th 172, 181 [settlement agreement in which city agreed not to enforce zoning ordinances against defendant's development in the future contravened public policy].)

Hollister warns that requiring a section 30609.5, subdivision (c) hearing here will require the Conservancy's board members to disclose privileged matters to the public, including advice it received from counsel during settlement negotiations. We disagree. Section 30609.5(c) does not prevent the board from receiving privileged memoranda or meeting in closed session with counsel to discuss pending litigation. (Gov. Code, §§ 6254.25, 11126, subd. (e)(2)(C), 11125.4, subd. (a).) We see no reason the board, once so advised, cannot deliberate and vote in a public setting about just one component of its proposed settlement agreement. That board members may invoke the attorney-client or work product privileges on occasion would not render the

15

section 30609.5 hearing a "sham," as Hollister argues, much less excuse the agency's statutory obligations under the Coastal Act.

*4. Section 30609.5 of the Coastal Act Applied*
*to the HROA Settlement and OTD*

When they settled, Hollister and the State Defendants ceased litigating the OTD's validity. The Alliance's writ petition returned the issue to the foreground. Hollister's opposition to the petition stressed that a void instrument like the OTD could not constitute an "ownership interest" in "'state land'" sufficient to trigger section 30609.5's hearing procedures. The State Defendants' having quitclaimed their interests in the OTD, it followed, they did not transfer cognizable property rights because no such rights existed. Alternatively, Hollister characterized the rights conveyed as an irrevocable license or some lesser interest that did not fit within the statute's express definition of "'state land,'" i.e., "a fee, title, easement, deed restriction, or other interest in land." (§ 30609.5, subd. (e).)

The trial court described Hollister's position as unduly reliant on "historic distinctions in real property law" that "[did] not serve the constitutional and legislative purposes of the Coastal Act." "It would upend the legislatively-declared policy of full public participation in the planning and implementation of coastal[] planning, conservation, and development," the court reasoned, "to allow a State entity to covertly dispose of coastal public property based upon the transferee's challenge to the validity of the State's ownership interest." Failing to comply with section 30609.5, subdivision (c)'s public hearing procedures thus rendered the HROA settlement "ineffective as to the Conservancy." We review this ruling independently. (See *Crocker National Bank v. City and County of San Francisco*

16

(1989) 49 Cal.3d 881, 888 [when the court's inquiry "requires a critical consideration, in a factual context, of legal principles and their underlying values, the question is predominantly legal and its determination is reviewed independently"].)

Section 30609.5, subdivision (e)'s defining language "fee, title, easement, deed restriction, *or other interest in land*" signals no intent to limit subdivision (c) to property rights fitting neatly into traditional classifications. (Italics added.) Labeling the State Defendants' interests is a task subordinate to discerning their rights and duties. "Arrangements between landowners and those who conduct commercial operations upon their land are so varied that it is increasingly difficult and correspondingly irrelevant to attempt to pigeonhole these relationships as 'leases,' 'easements,' 'licenses,' 'profits,' or some other obscure interest in land devised by the common law in far simpler times. Little practical purpose is served by attempting to build on this system of classification." (*Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 36.) One must read subdivision (e)'s definition in context. Section 30609.5 focuses on a transaction's effect on public access to the coast, not on the type or title of property right transferred.

Section 30609.5, subdivision (a)'s transfer restrictions apply to "existing or *potential* public accessway[s]." (Italics added.) This language indicates the statute applies when, as here, the precise nature of the property interest is not yet discerned. Whether the OTD and YMCA's alleged reliance thereon created an irrevocable license in favor of the public was an open issue when the trial court ruled on the Alliance's motion for

17

judgment.[16]  It had twice denied dispositive motions on the point. As such, the OTD remained a "potential accessway" to the coast until adjudicated otherwise.  How one categorized the property interest giving rise to this potential accessway was beside the point considering the procedural posture of the case at the time. We conclude the trial court correctly found a transfer had occurred under section 30609.5.[17]

Like the trial court, we express "no opinion and make[] no order as to the manner by which the Conservancy should or must proceed with respect to approval, or not, of the HROA Settlement."  Our ruling does not preclude Hollister and the State Defendants from attempting to align the settlement agreements' terms and conditions with section 30609.5's provisions, or, in the alternative, to jettison the agreements and litigate Hollister's quiet title action.

*5. The Trial Court Did Not Deprive Hollister of Due Process*

---

[16] An irrevocable license may occur "when a licensee expends time and money improving the licensed area under a justifiable belief that the licensor will not revoke the license." (6 Miller & Starr, Cal. Real Estate (4th Ed. 2021) § 15:45, p. 15-173.)  "In that case, the licensor is said to be estopped from revoking the license, and the license becomes the equivalent of an easement, commensurate in its extent and duration with the right to be enjoyed."  (*Richardson v. Franc* (2015) 233 Cal.App.4th 744, 751.)

[17] We likewise affirm the trial court's finding that entry of judgment on the Alliance's second cause of action mooted its two remaining causes of action under the Coastal Act, i.e., the fourth and fifth.  We do not address those parts of the cross-appeal directed to those causes of action.

18

Hollister contends the trial court deprived it of due process by entering judgment in the Alliance's favor without first deciding the validity of the OTD. By doing so, Hollister claims, the trial court excused the Alliance from its burden of proving the State Defendants violated section 30609.5. (Code Civ. Proc., § 1085; *California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1153.) This argument assumes proving an "interest in land" sufficient to trigger section 30609.5 is synonymous with proving the existence of a traditional property interest. These are distinct inquiries. The Alliance's prevailing on its section 30609.5 claim did not affirm the OTD's validity under traditional property law or strengthen the State Defendants' defenses to Hollister's quiet title action. The trial court decided the discrete issue of whether the HROA Settlement, as written, violated this provision of the Coastal Act. Hollister suffered no prejudice. It retains the right to proceed to trial on the merits of its claims against the State Defendants.

*6. The Trial Court's Evidentiary Rulings*

Hollister next contends the trial court erred by admitting hearsay evidence in support of the motion for judgment, including a list of facts to which the State Defendants and the Alliance but not Hollister stipulated. The writ petition is directed toward the State Defendants, not Hollister. The Alliance need not have introduced evidence "against" Hollister to prevail on its claims as to the State Defendants. Assuming it did, the stipulated facts were admissible as to Hollister because its rights under the cross-complaint turned exclusively on the State Defendants' liability. (Evid. Code, § 1224.)[18]

---

[18] Evidence Code, section 1224 states: "When the liability[,] obligation, or duty of a party to a civil action is based in whole or

19

### 7. *The Trial Court Erred When It Found Section 30609.5*
### *Did Not Apply to the Commission*

The trial court found the Alliance's section 30609.5 claim did not apply to the Commission because the agency did not "effect[] a transfer of state land separate from the Conservancy."[19]  Here we disagree.  The Coastal Act authorizes trial courts to "restrain any violation" of its provisions.  (See § 30803, subd. (a) [trial courts may adjudicate "action[s] for declaratory and equitable relief to restrain any violation" of the Coastal Act].)  The record shows the Commission and the Conservancy were united in seeking to effectuate the OTD's unlawful transfer.  The Class Action and HROA Settlements consistently refer to both agencies collectively as the "State."  Both were required to deed their purported interests in the OTD to Hollister.  The HROA Settlement included a provision in which

---

in part upon the liability, obligation, or duty of the declarant, or when the claim or right asserted by a party to a civil action is barred or diminished by a breach of duty by the declarant, evidence of a statement made by the declarant is as admissible against the party as it would be if offered against the declarant in an action involving that liability, obligation, duty, or breach of duty."

[19] The proposed quitclaim deed contains separate signature blocks for the Conservancy and the Commission.  The following language appears directly above the Commission's block, but not the Conservancy's:  "Acknowledged and agreed to with regard to the extinguishment and abandonment of the Offer to Dedicate."  The trial court interprets this language as reducing the Commission's status in the transaction from that of a direct signatory to that of an "interested party."

20

each agency "disavows, abandons, extinguishes, cancels, and disclaims any right, title, or interest whatsoever" in the OTD. Entering judgment in the Commission's favor effectively immunized the agency for its supporting role in this transaction, or, at least, implied the trial court was powerless to restrain state actors that enable violations of the Coastal Act by repository agencies such as the Conservancy and Department of Parks and Recreation.

The trial court alternatively held the 60-day period to seek writ relief against the Commission had expired before the Alliance intervened. This too was error. The court calculated accrual from the date the Commission's board approved the HROA Settlement. (See § 30801 [seeking judicial review of any "decision or action" of the Commission requires petitioning for writ of mandate "within 60 days after the decision or action has become final"].) However, the settlement's approval by the Commission's board was only the first of many acts required of the agency. The period to challenge the settlements would have accrued, at earliest, when the Commission completed those acts required to consummate the unlawful transfer.[20] This would have been when it delivered a quitclaim deed to Hollister within five days of the court entering the stipulated judgment.[21] This

---

[20] The Alliance briefed the discovery rule and doctrine of equitable tolling extensively and requested judicial notice of materials illustrating the opacity of the superior court's online register of actions. Our holding obviates the need to address these issues. We nevertheless grant the Alliance's request for judicial notice dated March 24, 2021.

[21] The HROA Settlement, in fact, specified entry of judgment as its effective date.

21

had not occurred when the Alliance sought intervention or when it filed its cross-complaint.

The trial court shall enter judgment against both State Defendants on remand.

### 8. *The Trial Court Correctly Ruled the Limitations Period Expired on the Alliance's Bagley-Keene Act Cause of Action*

The writ petition's seventh cause of action alleged the State Defendants violated the Bagley Keene Act when they approved the HROA Settlement in closed session. (Gov. Code, § 11123, subds. (a) & (b).) The trial court found the claim barred by the Act's 90-day limitations period. (See *id.* § 11130.3, subd. (a) [one seeking "mandamus, injunction, or declaratory relief" to address violations of Government Code, section 11123 or 11125 must commence an action "within 90 days from the date the action was taken"].) It declined to apply the discovery rule or equitable tolling despite allegations that the State Defendants had concealed the settlements from the Alliance and other members of the public. On cross-appeal, the Alliance contends the trial court applied superseded case law, i.e., *Regents of University of California v. Superior Court* (1999) 20 Cal.4th 509 (*Regents*). We disagree and conclude *Regents* controls.

Plaintiff in *Regents* alleged the governor and certain members of the Board of Regents violated the Bagley-Keene Act by approving two resolutions in private meetings then holding a sham vote in open session to legitimize what occurred behind closed doors. Plaintiff sought writ relief seven months after the open-session approval. He acknowledged missing the Act's filing deadline but asserted the equitable doctrine of fraudulent concealment tolled his cause of action. The trial court allowed

22

the claim to proceed; the Court of Appeal denied the Regents mandamus relief. Our Supreme Court reversed. It concluded former section 11130.3's plain directive that one must commence an action "'within 30 days from the date the action was taken'" did not accommodate the doctrine of fraudulent concealment. The statute "authorize[d] the nullification and voidance of an action taken by a state body" in violation of the Bagley-Keene Act "but only under strict conditions—which, in their absence, entail[ed] the protection of even the most deceptive defendant from the freshest claim of the most diligent plaintiff." (*Regents*, *supra*, 20 Cal.4th at p. 534.)

*Regents* prompted the Legislature to amend the Bagley Keene Act by passing Assembly Bill 1234 (AB 1234). Section 5 of AB 1234 stated: "This bill would declare the intent of the Legislature in making these changes to the act to supersede the decision of the California Supreme Court in [*Regents*]." These changes did not, as the Alliance argues, abrogate the Court's decision in full. The bill extended Government Code section 11130.3(a)'s 30-day limitations period to 90 days and added language to a companion statute, section 11130, rejecting *Regents'* holding that writ relief extended only "to present and future actions and violations and not past ones." (*Regents*, *supra*, 20 Cal.4th at p. 518; Assem. Bill No. 1234 (1999-2000 Reg. Sess.) §§ 4-6.) The remaining amendments focused on the manner agencies posted notice of their decisions on the fledgling Internet. None disturbed *Regents'* accrual ruling, which characterized the deadline to challenge Bagley-Keene violations as akin to a statute of repose. (See *Regents* at p. 528 ["[S]ection 11130(a)'s 30-day statute of limitation simply does not fix the inception of its limitations period by reference, without any date, to discovery or

23

even accrual. It does so, rather, as of the date of the taking of the action in question. This fact is significant. Indeed, it is controlling."].)

CONCLUSION

The trial court correctly invalidated the State Defendants' settlement agreements with Hollister based on the Conservancy's violation of section 30609.5 of the Coastal Act. Judgment against the Conservancy is affirmed in that respect. Judgment in favor of the Commission, however, is reversed because the record confirms it too violated section 30609.5. The trial court shall enter judgment against both State Defendants on remand.

Judgment is otherwise affirmed. The Alliance shall recover its costs on appeal.

<u>CERTIFIED FOR PUBLICATION</u>

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

24

Colleen K. Sterne, Judge
Superior Court County of Santa Barbara

_____

Cappello & Noël, A. Barry Cappello, Wendy D. Welkom and David L. Cousineau for Plaintiffs and Appellants Carolyn Pappas, Tim Behunin and Patrick L. Connelly.

Brownstein Hyatt Garber Schreck, Steven Amerikaner and Beth Ann Collins for Plaintiffs and Appellants Hollister Ranch Owners' Association and The Hollister Ranch Cooperative.

Xavier Becerra and Rob Bonta, Attorneys General, Daniel A. Olivas, Assistant Attorney General, and Jamee Jordan Patterson, Deputy Attorney General, for Defendants and Respondents.

Shute, Mihaly & Weinberger, Ellison Folk and Andrew P. Miller; Law Office of Marc Chytilo, Marc S. Chytilo and Ann Citrin for Intervenor and Appellant.

25